NEIL E. JOKELSON & ASSOCIATES, P.C.
BY: NEIL E. JOKELSON, ESQUIRE
ATTORNEY I.D. #02486
230 South Broad Street, 10th Floor
Philadelphia, PA 19102
(215) 735-7556

Filed and Attested by
PROTHONOTARY
01 APR 2010 04:09 pm
J. SHELLENBERGER

| | | |
|---|---|---|
| GLOBAL POWER SOLUTIONS, LLC.<br>116 Village Boulevard, Suite 309<br>Princeton, NJ 08540 | : | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY |
| vs. | : | |
| MERCURY MANAGEMENT, INC.,<br>a Pennsylvania Corporation<br>150 West Church Street, Suite 1000<br>King of Prussia, PA 19406 | : | Civil Action No.<br><br><br>JURY TRIAL DEMANDED |
| and | : | |
| JOSEPH J. SZLAVIK<br>2116 Kratz Station Road, Building One<br>King of Prussia, PA 19406 | : | |

## NOTICE TO PLEAD

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Reference Service
PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone: 215-238-1701

AVISO

Le Han demanndo a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de las comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objectiones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpia con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABROGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO. VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Lawyer Reference Service
PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone: 215-238-1701

Case ID: 100306480

NEIL E. JOKELSON & ASSOCIATES, P.C.
BY: NEIL E. JOKELSON, ESQUIRE
ATTORNEY I.D. #02486
230 South Broad Street, 10th Floor
Philadelphia, PA 19102
(215) 735-7556

Filed and Attested by
PROTHONOTARY
01 APR 2010 04:09 pm
J. SHELLENBERGER

| | | |
|---|---|---|
| GLOBAL POWER SOLUTIONS, LLC.<br>116 Village Boulevard, Suite 309<br>Princeton, NJ 08540 | : | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY |
| vs. | : | |
| MERCURY MANAGEMENT, INC.,<br>a Pennsylvania Corporation<br>150 West Church Street, Suite 1000<br>King of Prussia, PA 19406 | : | Civil Action No.<br><br>JURY TRIAL DEMANDED |
| and | : | |
| JOSEPH J. SZLAVIK<br>2116 Kratz Station Road, Building One<br>King of Prussia, PA 19406 | : | |

**COMPLAINT**

1. Plaintiff Global Power Solutions, LLC ("**GPS**") is a Delaware limited liability company with its principal place of business at 116 Village Boulevard, Suite 309, Princeton, NJ 08540.

2. Defendant Mercury Management, Inc. ("**Mercury**") is a Pennsylvania Corporation with its principal place of business at the address identified above.

3. Defendant Joseph J. Szlavik ("**Szlavik**") is an individual residing or maintaining at the above address. Upon information and belief, Szlavik is the sole shareholder and President of Defendant Mercury.

4. On or about March 27, 2009, Stars Holding Company, LLC ("**Stars**"), Dr. Lawrence D.

Segal ("**Segal**"), and Mercury (collectively, the "**Members**"), entered into a Limited Liability Company Agreement of Global Power Solutions, LLC (the "**LLC Agreement**") governing GPS as a Delaware limited liability company pursuant to the terms and conditions stated therein. Ex. 1.

5. Tameem Ahmed is a member and the manager of Stars.

6. Pursuant to the terms of the LLC Agreement and Exhibit A thereto, the Member Ownership Percentage, as defined therein, stated that Stars had a 70% ownership percentage, Segal had a 15% ownership interest, and Mercury had a 15% ownership interest. *See* Ex. 1 at Exhibit A.

7. Despite their positions as minority members in GPS, neither Mercury nor Segal have contributed capital to GPS or otherwise funded the operations of GPS. The operations of GPS have been funded exclusively by its majority member Stars.

8. Since at or around the time GPS was organized as a Delaware limited liability company, and at all relevant times thereafter, GPS maintained the following bank accounts with Bank of America ("**BOA**"):

   a. Account No. 381014600241;

   b. Account No. 381014600268; and

   c. Account No. 381014600238.

(the "**BOA Accounts**"). The BOA Accounts were each titled in the name of GPS and contained funds belonging to solely to GPS. All monies belonging to GPS were maintained in the BOA Accounts.

9. GPS operated and maintained BOA Accounts pursuant to Article 9 of the LLC

Agreement, which provided:

> The funds of the Company shall be kept in one or more separate bank or brokerage accounts in the name of the Company in such banks or other federally insured depositories or brokerage firms as may be designated by the Board or shall otherwise be invested in the name of the Company in such manner and upon such terms and conditions *as the Board deems appropriate*. No funds, other than funds of the company, shall be deposited in any of such accounts, and no funds shall be commingled with the Company's funds (a common investment account shall not be deemed a commingling so long as the Company's funds therein are separately accounted for). All withdrawals from any such bank accounts or investment accounts established by the Board hereunder shall be made on such signature or signatures *as may be designated by the Board*.

Ex. 1, Article 9 (emphasis added).

10. Upon information and belief, from the inception of the BOA Accounts up through and until March 17, 2010 when the BOA Accounts were closed, BOA maintained signature cards identifying Mr. Ahmed and Jenifer Raffa, GPS's Administrative Manager, as the sole and exclusive signators on the BOA Accounts.

11. Pursuant to the LLC Agreement, Segal was appointed as the sole Manager of GPS.

12. Upon execution of the Unamimous Written Consent of The Members of Global Power Solutions, LLC In Lieu of a Special Meeting of Members and the Written Consent of The Sole Manager of Global Power Solutions, LLC, dated as of April 8, 2009, it was resolved that Segal resigned as the Manager and President of GPS. It was further resolved that Mercury was appointed as sole Manager and Szlavik was appointed as President. Ex. 2.

13. Pursuant to the terms of the LLC Agreement, the Manager and President have limited authority. In this regard, the authority of any Manager is limited through, inter alia, the provisions of Section 7.3 of the LLC Agreement which provides that:

Notwithstanding the foregoing, and subject to Section 3.8.5, neither the Managers nor officers shall, without the prior consent of both the Board and a Majority in Interest of Members, have authority to:

(a) borrow on the credit of the Company, or refinance any approved loans or indebtedness of the Company, except as otherwise provided in this Agreement or in accordance with any budget, that shall have been Approved by the Members pursuant to this Section 7.3;

(b) subject all or any portion of the Company's assets to any security interest, lien or other encumbrances;

(c) execute or deliver any note or other commercial paper which subjects the Company or any Member to liability;

(d) purchase, contract to purchase, lease or execute any option for the purchase of any real property, or any personal property with a value in excess of $50,000;

(e) sell, exchange, convey, lease, or otherwise transfer any significant Company property, or portion thereof, or grant to any person an option with respect thereto;

(f) take any action which expressly requires the Approval of the Members under this Agreement;

(g) admit Members to the Company or issue any additional Member Units to any Entity;

(h) redeem the Member Units of any Member;

(I) borrow funds from the Company;

(j) make a payment to a Member, except as otherwise provided in this Agreement, or in accordance with a budget that shall have been Approved by the Members pursuant to this Section 7.3;

(k) confess a material judgment against the Company, commence any material legal action against a third party or settle any material legal action involving the Company;

(l) make any election under the tax laws of the United States or the State of Delaware, except as expressly permitted in this Agreement;

(m) enter into any contract or agreement by the Company that shall obligate the Company, either directly or contingently, to provide products or services valued in excess of, or pay more than, $50,000 over the entire term of the contract or agreement;

(n) merge or consolidate the Company with or into any other Entity;

(o) settle condemnation, litigation or insurance matters if such settlement provides for the payment by or to the Company of more than $50,000.00;

(p) select professional advisers for the Company, including certified public accountants and attorneys;

(q) determine the Company's accounting method;

(r) modify or amend the Certificate of Formation;

(s) cause the Company to guarantee or become obligated for the debts or obligations of any other person or entity or hold out its credit as being available to satisfy the obligations of others, or pledge its assets for the benefit of any other person or entity; or

(t) elect any person or entity to act as a Manager of the Company.

14. Pursuant to the LLC Agreement, the authority of the President is subservient to the Board of Managers.

15. During Mercury's tenure as Manager and Szlavik's tenure as President, Mercury and Szlavik engaged in acts of fraud and dishonesty. In this regard, Szlavik and/or Mercury abused their association with GPS by, inter alia, causing improper charges against GPS's American Express account for, upon information and belief, the benefit of Szlavik, individually, and/or Mercury. Said charges consisted, inter alia, of the following:

| Date Incurred | Description | Amount |
|---|---|---|
| 12/15/09 | Sheraton Park Tower Hotel, London, England | $ 67.71 |
| 12/14/09 | ACC Department Perfect Restaurants, Ltd. London, England | $249.89 |
| 12/14/09 | Ask Byron, London, England | $ 56.83 |
| 12/14/09 | Heathrow Express Operating Comp., Heathrow Airport, England | $ 30.09 |
| 12/14/09 | Ibahn UK, Ltd., Reading, England | $ 8.36 |
| 12/14/09 | Perfect Restaurants, Ltd, London, England | $1,002.90 |
| 12/11/09 | Sheraton Park Tower Hotel, London, England | $ 577.32 |
| 12/11/09 | Vonage America | $ 81.54 |
| 12/10/09 | British Airways Internet Sales re: London Heathrow/Newark, NJ | $3,427.50 |
| 12/9/09 | The Store 800000 Las Vegas, Nevada | $ 125.07 |
| 12/7/09 | Vonage America | $ 77.49 |
| 12/3/09 | TTLC Internet 295323DOVER | $ 14.95 |
| 11/16/09 | Meridien Re Ndama Libreville Gabon | $ 982.39 |

None of the aforesaid charges were authorized by or incurred for the benefit of GPS. Rather, these charges, made without approval from GPS and in violation of the duties, fiduciary and otherwise, owed to GPS, were unrelated to the business of the GPS and, upon information and belief, were for the benefit of Szlavik, individually, and/or Mercury. Such charges constituted waste of the GPS's assets and an attempt by the defendants to convert to their own use the plaintiff's assets.

16. Further in disregard of the express limitations upon their ability to select professional advisors of GPS, Szlavik and Mercury caused the purported the selection and retention of Musolino & Dessel, a Washington D.C. for the ostensible purpose of providing professional services to GPS without the consent of a Majority in Interest of Members.

17. On January 25, 2010, through the execution on that date of 1) Written Consent In Lieu of Special Meeting of a Majority in Interest of the Members of Global Power Solutions, LLC, 2) Written Consent in Lieu of Special Meeting of the Managers of Global Power Solutions, LLC, and 3) First Amendment to the Limited Liability Company Agreement, it was resolved and agreed that Mercury was removed as the sole Manager of GPS, and that Kevin Barnes, Zain Haseeb and Danyal Hussain were appointed as the sole Managers of GPS. Ex. 3.

18. Notwithstanding the foregoing, upon information and belief, on or about March 17, 2010, at approximately 2:00 - 2:30 p.m., Szlavik, having knowledge of the actions taken as described above in Paragraph 17, acting both on his own behalf and on behalf of Mercury, presented himself to a BOA branch office in Trappe, Pennsylvania, which branch office had never been previously utilized to conduct any business of the plaintiff.

19. Upon information and belief, Szlavik elected to appear at the BOA branch office in Trappe, Pennsylvania, as opposed to the BOA branch office in Marlton, New Jersey where the plaintiff did its BOA banking business, so as to more readily effectuate the actions which he took as hereinafter described. Such actions consisted of Szlavik convincing, inter alia, the BOA Trappe branch manager to close all of the BOA Accounts, which, at that time, had a cumulative account balance of approximately $104,000.00, and

to issue three cashier's checks with funds drawn from the aforesaid accounts in the approximate amounts of $19,000.00, $6,000.00 and $2,000.00, based upon the purported instruction of Szlavik, with said payees being Musolino & Dessel, Greenberg Traurig, and a third party, who ostensibly Szlavik had hired to be the bookkeeper for the plaintiff, respectively.

20. Upon information and belief, Szlavik further caused the Trappe, Pennsylvania BOA branch employees to open a new account(s) ostensibly in the name of GPS, but with Szlavik and/or his nominee as the sole signator(s). Szlavik caused the remaining funds from the closed BOA Account to be deposited into this new account(s). Upon information and belief, said funds totaled approximately $77,000.00. While these funds are the exclusive property of the GPS, said funds have now been placed beyond GPS's control and within the sole control of the defendants. Said action was taken by Szlavik in an attempt to prejudice the interests of the plaintiff and to advance his own personal interests and those of Mercury at the expense of plaintiff.

21. Contemporaneous to the actions as aforesaid, and also on March 17, 2010, defendant Szlavik, purporting to be "President and Manager" of plaintiff, wrote to Greenberg Traurig, which was and remains counsel to plaintiff, a letter stating, inter alia:

> With this letter, Global Power Solutions, LLC terminates its retainer relationship for legal counsel representation by Greenberg Traurig LLP, which was contracted in March 2009.
>
> This termination is effective immediately.

Ex. 4. Upon information and belief, at said time, Szlavik knew that he was no longer the Manager of plaintiff and was without authority to write to Greenberg Traurig and

terminate their representation of the plaintiff. Said action was taken by Szlavik in an attempt to prejudice the interests of the plaintiff and to advance his own personal interests and those of Mercury at the expense of plaintiff.

22. None of the aforesaid actions taken by Szlavik were authorized by any Manager or Board of Managers of the plaintiff or by a Majority in Interest of Members, and were in express violation of Section 7.3 of the LLC Agreement and/or constituted a usurption of authority and/or an act of ultra vires on the part of Szlavik.

23. In light of, inter alia, Szlavik's and Mercury's conduct as set forth above, the plaintiff's Board of Managers, on March 18, 2010, executed a Written Consent in Lieu of Special Meeting of the Managers of Global Power Solutions, LLC" which provided in relevant part:

> **WHEREAS,** the Board, by Written Consent dated January 25, 2010, removed Mercury Management, Inc. ("Mercury") as Manager of the Company and designated, appointed and elected the undersigned Managers to act as Managers of the Company.
>
> **NOW, THEREFORE, BE IT RESOLVED,** that the Board does hereby confirm that neither Mercury, nor its controlling shareholder, Joseph Szlavik, have any power or authority to act on behalf of the Company in any capacity, whatsoever, including, without limitation, any power or authority with respect to any bank accounts or funds of the Company.
>
> **RESOLVED**, that the Board does hereby designate, appoint and elect Zain Haseeb as President of the Company, effective immediately and confirm that no other individual has any authority to act as President of the Company, including, without limitation, Joseph Szlavik.
>
> **RESOLVED**, to the extent Joseph Szlavik may assert any right, power or authority to act on behalf of the Company in any capacity, the Board does hereby, without acknowledging the existence of any such right, power or authority of Joseph Szlavik to so act on behalf

> of the Company and for the purpose of avoiding any further dispute with respect thereto, remove, terminate and cancel any such right, power and authority of Joseph Szlavik, to the extent that it may exist.

Ex. 5.

24. Notwithstanding the foregoing, on or about March 19, 2010, Szlavik issued a memorandum on the stationery of the plaintiff:

> **TO:** All Members/Shareholders of Global Power Solutions, LLC
>
> **FROM:** Joseph J. Szlavik
> GPS President, GPS Manager, and Mercury President

wherein Szlavik, on purported behalf of the plaintiff, stated that he had:

> retained both an accountant and a bookkeeper. The accountant is M.A. Metropole, CPA, of Blue Bell, Pennsylvania. The bookkeeper is Bookkeeping and More, Inc. We have paid the bookkeeping firm $2,000 for its services with regard to 2009 and 2010 bank accounts.
>
> In addition, the Internal Revenue Service has been notified that we are seeking a six-month extension for filing our 2009 tax returns. I have also informed the IRS that any tax records or returns that may have been filed for 2009 should be disregarded until a proper return is filed.

Ex. 6.

25. At the time that Szlavik took the actions as described in Exhibit 5, he acted with malice and knew that he was without authority to take such actions in that, inter alia, Mercury was no longer a Manager of the plaintiff and that the actions he took would interfere and prejudice the plaintiff's ability to conduct its business, maintain a proper relationship with the Internal Revenue Service and others, and interfere with the relationships that the plaintiff enjoyed with its administrative manager and other third parties.

26. As a result of the foregoing, the plaintiff has been injured, inter alia, in its ability to operate its business and will suffer future injuries and loss of income as a result of the actions of the defendants as described.

27. On or about March 22, 2010, plaintiff, through its counsel, Greenberg Traurig, made demand upon the defendants that they:

> 1. Immediately cease and desist from purporting to have any power or authority, as Manager, President or otherwise, to act for or on behalf of GPS on any matter or in any capacity;
>
> 2. Inform Bank of America, in writing, no later than the close of business on Wednesday, March 24, 2010, that the newly created bank account and all other GPS accounts are to be subject to the full control of the GPS Board, comprised of Kevin Barnes, Zain Haseeb and Danyal Hussein, and take whatever other steps Bank of America requires to ensure that all GPS accounts are subject to the full control of Messrs. Barnes, Haseeb, and Hussain;
>
> 3. Inform the accounting firm (identified as M.A. Metropole, CPA,) the bookkeeping firm (identified as Bookkeeping and More, Inc.) and the attorney (identified as Musolino & Dessel PLLC), in writing, no later than close of business on Tuesday, March 23, 2010, that they are to cease, immediately, any and all work for GPS and to turn over to the Board all work product and all GPS records in their possession;
>
> 4. Immediately reimburse GPS, in full, for any and all amounts paid by Mercury or Mr. Szlavik with GPS funds, to such accounting firm, such bookkeeping firm and such attorney (and to any other person or entity);
>
> 5. Inform such accounting firm, such bookkeeping firm and such attorney, in writing, no later than Tuesday, March 23, 2010 that: (a) Mr. Szlavik and/or Mercury shall be fully responsible for any remaining fees, costs or expenses payable to any of them for work purportedly performed by them for GPS; and (b) they must send GPS a full and complete accounting of all amounts billed or to be billed to

GPS and all amounts previously paid to them by GPS; and

6. Immediately agree, in writing, to jointly and severally indemnify, defend and hold harmless GPS and its Members, Managers, officers, employees, attorneys and agent from and with respect to any loss, liability, cost or expense resulting from or related or attributable to, the actions taken by Mercury and Mr. Szlavik, as described above.

Ex. 7.

28. Notwithstanding the receipt of Exhibit 6, the defendants have refused to comply with the demands set forth above.

**COUNT I**
**ACTION PURSUANT TO 42 PA. C.S. SECTION 7531, ET SEQ.**
**(DECLARATORY JUDGMENTS ACT)**

29. Paragraphs 1-28 are incorporated herein by reference as though more fully set forth at length.

30. Plaintiff seeks this Court, pursuant to 42 Pa. C.S. Section 7532 to declare the rights, status and other legal relations as they have and presently exist between the plaintiff and the defendants Szlavik and Mercury. Plaintiff seeks this Court to declare, inter alia, that Szlavik and Mercury are not Manager or Officers of the plaintiff and have no right to act in such capacities on behalf of the plaintiff. Plaintiff further seeks this Court to declare and confirm that a Disabling Event has occurred, that Mercury is a Disabled Member and that Plaintiff may take such actions necessary to exercise its remedies and/or options, including the option to purchase Mercury's Member Interest, all pursuant to Article 13 of the LLC Agreement.

WHEREFORE, plaintiff requests that this Court grant the relief requested in this Count as such other relief as would be just and proper under the circumstances and as authorized by the Declaratory Judgment Act.

**COUNT II**
**INTENTIONAL INTERFERENCE WITH PRESENT AND PROSPECTIVE BUSINESS RELATIONS**

31. Paragraphs 1-30 are incorporated herein by reference as though more fully set forth at length.

32. The actions of the defendants as aforesaid constituted an intentional interference with both present and prospective business relations of the plaintiff, all of which has and will cause harm and damage to the plaintiff.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, in an amount in excess of $50,000.00, for both compensatory and punitive damages.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**

33. Paragraphs 1-32 are incorporated herein by reference as though more fully set forth at length.

34. Each of the defendants had received on a confidential basis proprietary information belonging to the plaintiff concerning, inter alia, bank accounts belonging to the plaintiff, identity of professionals and others providing services to the plaintiff. The defendants had been entrusted by the plaintiffs with the apparent indicia of authority to act on behalf

of the plaintiffs by, inter alia, the plaintiff having at one time defendant Szlavik serve as its president and defendant Mercury serve as a manager.

35. Notwithstanding the aforesaid entrustments of information and position to the defendants by the plaintiff, the defendants, jointly and severally, and in concert with one another, abused the plaintiff by utilizing the aforesaid entrustments of information and position in violation of a fiduciary duty(ies) which they each owed to the plaintiff resulting in the harm and damage as aforedescribed.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, in an amount in excess of $50,000.00, for both compensatory and punitive damages.

**COUNT IV**
**CONVERSION**

36. Paragraphs 1-35 are incorporated herein by reference as though more fully set forth at length.

37. By the actions of the defendants as aforesaid, they have converted monies belonging to the plaintiff by either placing said monies beyond the reach of the plaintiff and by wasting same by expenditures which were not authorized by the plaintiff. The aforesaid actions of the defendants were knowing and malicious.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, in an amount in excess of $50,000.00, for both compensatory and punitive damages.

**COUNT V**
**INJUNCTIVE RELIEF**

38. Paragraphs 1-37 are incorporated herein by reference as though more fully set forth at

length.

39. Defendants, by and through their actions, have caused and are causing Plaintiff irreparable.

WHEREFORE, Plaintiff ask that this Honorable Court enjoin Defendants from representing themselves to be Managers and/or Officers of Plaintiff, and form taking any actions in such purported capacities, and such other injunctive relief as the Court deems necessary or proper.

/s/
NEIL E. JOKELSON, ESQUIRE



Filed and Attested by
PROTHONOTARY
01 APR 2010 04:09 pm

**VERIFICATION**

I, Zain Haseeb, verify that the statements made in the within Complaint are true and correct. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities.

ZAIN HASEEB
President and Manager
Global Power Solutions, LLC

Date: 4/1/10

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**GLOBAL POWER SOLUTIONS, LLC**

THIS LIMITED LIABILITY COMPANY AGREEMENT OF GLOBAL POWER SOLUTIONS, LLC, is made and entered into as of March ___, 2009, by and among those Entities executing this Limited Liability Company Agreement as Members and Entities hereafter becoming parties hereto (hereinafter referred to in the singular as "Member" and collectively as the "Members").

W I T N E S S E T H:

WHEREAS, the Initial Members are the sole stockholders of Global Power Solutions, Inc., a Delaware corporation and have elected to convert Global Power Solutions, Inc. into a Delaware limited liability company (the "Company") to be operated subject to the terms and provisions set forth in this Limited Liability Company Agreement (the "Agreement"), effective as of the effective date of such conversion (the "Effective Date").

WHEREAS, the Initial Members have agreed to undertake the purposes, as described below, through the Company.

NOW, THEREFORE in consideration of the premises, and of the mutual promises, obligations, and agreements contained herein, the parties hereto, intending to be, and being, legally bound, do hereby covenant and agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1 Definitions. In addition to terms defined in the body of this Agreement, each of the following capitalized terms has the meaning hereinafter provided (such meanings shall also be applicable to the plural use of such terms herein):

Act. "Act" means the Delaware Limited Liability Company Act as hereafter amended, and any successor statute thereto.

Additional Capital Contribution. "Additional Capital Contribution" means a Capital Contribution to the Company made by a Member pursuant to Section 3.3 hereof.

Affiliate. An Entity shall be deemed an "Affiliate" of a party in the event the Entity controls, is controlled by or under common control with the party. "Control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with") as applied to any person, means the possession, directly or indirectly, of the power to

direct or cause the direction of the management and policies of that person, whether through the ownership of voting securities, by contract or otherwise.

Approve; Approval. "Approve" and "Approval" means approval, in accordance with this Agreement, by the Members, or Managers, as the case may be, of any matter or action requiring such approval hereunder. Unless otherwise specifically indicated, any matter submitted to the Members for Approval shall require the Approval of a Majority in Interest of the Members.

Assumed Tax Rate. "Assumed Tax Rate" means, with respect to a Fiscal Year, the highest effective marginal combined federal, state and local income tax rate applicable to the Member having the highest combined income tax bracket, taking into account the character (e.g. long-term or short-term capital gain or ordinary or tax-exempt) of the applicable income.

Board; Board of Managers. "Board" or "Board of Managers" means the Board of Managers which shall be comprised of all of the Company's Managers.

Capital Accounts. The term "Capital Account" is defined in Section 3.5 hereof.

Capital Call Notice. The term "Capital Call Notice" is defined in Section 3.3 hereof.

Capital Contribution. "Capital Contribution" means any contribution, as defined in Section 18-101 of the Act, whenever made in accordance with Article 3 hereof by a Member or Economic Interest Owner to the capital of the Company in cash or, with the approval of the Board, non-cash property (valued at its Gross Asset Value).

Capital Contribution Account. "Capital Contribution Account" means a bookkeeping account maintained for each Member equal to the aggregate of all Capital Contributions (including Initial Capital Contributions and Additional Capital Contributions) to the Company made by such Member pursuant to Sections 3.1 or 3.3, respectively, of this Agreement, less the aggregate distributions to such Member pursuant to Sections 5.2.1 and 5.3.3 of this Agreement (until such Capital Contribution Account equals zero). The Capital Contribution Accounts for the Members, as of the Effective Date, are as set forth on Exhibit "A."

Capital Transaction. "Capital Transaction" means (a) a transaction pursuant to which the indebtedness secured by any significant assets of the Company is refinanced by the Company; (b) a sale, exchange or disposition of any significant assets of the Company; or (c) the condemnation or casualty of any significant assets of the Company.

Certificate of Conversion. "Certificate of Conversion" means the Certificate of Conversion of the Company, as filed with the Secretary of State of Delaware, converting GPS, Inc. into the Company as a Delaware limited liability company.

Certificate of Formation. "Certificate of Formation" means the Certificate of Formation of the Company, as filed with the Secretary of State of Delaware, as the same may be amended, supplemented or restated from time to time.

#1316308.875

Code. "Code" means the Internal Revenue Code of 1986, as amended from time to time. All references herein to specific sections of the Code shall be deemed to refer also to any corresponding provisions of succeeding law.

Company. "Company" means this Global Power Solutions, LLC, a Delaware limited liability company.

Company Minimum Gain. "Company Minimum Gain" has the meaning set forth in Section 1.704-2(d) of the Regulations. Subject to the foregoing, Company Minimum Gain shall equal the amount of gain, if any, which would be recognized by the Company with respect to each Nonrecourse Liability of the Company if the Company were to transfer the Company's property which is subject to such Nonrecourse Liability in full satisfaction thereof.

Depreciation. "Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deductions allowable for federal income tax purposes with respect to any Company property for such Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

Distributable Cash. "Distributable Cash" means all cash, revenues and funds received by the Company other than Net Proceeds from a Capital Transaction, including Reserves that the Board deems to be no longer necessary, less the sum of the following to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; and (b) all cash expenditures incurred incident to the normal operation of the Company's business; and (c) such Reserves as the Board deems reasonably necessary to the proper operation of the Company's business.

Economic Interest. "Economic Interest" means a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any right to vote on, consent to or otherwise participate, as a Member, in any action or decision of the Members or management of the Company.

Economic Interest Owner. "Economic Interest Owner" means the owner of an Economic Interest who is not a Member with respect to such interest.

Entity. "Entity" means any person or any corporation, partnership (general or limited), limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, or other business entity or organization.

Fair Market Value. "Fair Market Value" of the Company at any time and from time to time means the fair market value of the Company as of the last day of the month immediately

prior to the relevant date, such fair market value being determined in good faith by a Majority in Interest of the Members. In making the determination of the Fair Market Value pursuant to this subsection, the Members shall assume that the Company's Fair Market Value is equal to the amount which would be paid in cash for the Company, as a going concern, by an unaffiliated third party buyer. The Fair Market Value of any Member Interest shall be based upon the Fair Market Value of the Company. The Members may, but shall not be obligated to, engage the services of an experienced investment banking or business valuation firm to assist it in the determination of Fair Market Value. The cost of determining Fair Market Value shall be borne by the Company.

Fiscal Year. "Fiscal Year" means the fiscal year of the Company. The first Fiscal Year shall commence on the date of the formation of the Company, and each succeeding Fiscal Year shall commence on the day immediately following the last day of the immediately preceding Fiscal Year. Each Fiscal Year shall end on the earliest to occur after the commencement of such Fiscal Year of (i) December 31, or (ii) the date on which the Company is terminated under Section 14.4.

For Cause Event. "For Cause Event" means, with respect to any Member or Manager that such Member or Manager commits fraud, embezzlement or other intentional dishonest or illegal acts with respect to the Company, or its Affiliates or is convicted of (or enters a plea of guilty or nolo contendre to) any crime involving moral turpitude or any felony by the Manager or Member that may reasonably be expected to have a materially adverse effect on the business, or reputation of the Company or any of its Affiliates, as determined by the Members. If a Manager is also a Member, the occurrence of a For Cause Event with respect to such Entity will apply to such Entity as both a Member and a Manager.

GPS, Inc. "GPS, Inc." means Global Power Solutions, Inc., a Delaware corporation, which corporation was converted into the Company, a Delaware limited liability company, upon the filing of the Certificate of Conversion with the Secretary of State of Delaware.

Gross Asset Value. "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a) the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value of such asset as of the date of such contribution, as determined by the Board;

(b) the Gross Asset Values of all Company assets may be adjusted to equal their respective gross fair market value, each as determined by the Board, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* capital contribution and on a basis other than as contemplated herein regarding the acquisition of interests in the Company; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company; (iii) the grant of an additional interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by any new or existing Member in such Member's capacity as a member of the Company or in

anticipation of becoming a Member of the Company and (iv) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; provided, however, that adjustments pursuant to clauses (i), (ii) and (iii) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c) the Gross Asset Value of any Company asset shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations; provided, however, that Gross Asset Values shall not be adjusted pursuant to this Subsection (c) to the extent the Board determines that an adjustment pursuant to Subsection (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Subsection (c);

(d) the Gross Asset Value of any Company asset distributed to any Member shall be the fair market value of such asset on the date of distribution, as determined by the Board; and

(e) if the Gross Asset Value of an asset has been determined or adjusted pursuant to the foregoing Subsections (a), (b) or (c) of this definition, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

Initial Capital Contribution. "Initial Capital Contribution" means a Capital Contribution to the Company made by a Member pursuant to Section 3.1 hereof.

Initial Member. "Initial Member" means each of the Members that are party to this Agreement.

Majority in Interest. A "Majority in Interest" of any relevant group of Members, as of any given date, means those Members in such group owning more than fifty percent (50%) of the Member Interests in the Company owned by all of the Members in such group.

Manager. "Manager" means each of the Entities listed on Exhibit "B" attached hereto, who shall manage the Company, any successor thereto and any other managers, elected, from time to time, in accordance with the terms of this Agreement.

Member. "Member" means each of the Entities executing this Agreement as a Member, such Members being listed on Exhibit "A" attached hereto and made a part hereof, and any other Entity which may hereafter become a Member in accordance with this Agreement (but excluding any Entity which ceases to own any Member Interest). If a Manager holds a Member Interest in the Company, such Manager will have all the rights of a Member with respect to such Member Interest, and the term "Member" as used herein shall include a Manager to the extent such Manager holds a Member Interest in the Company.

#1 316,408 v2

Member Interest. "Member Interest" means the interest of a Member in the Company, including all rights, duties and obligations of being a Member in accordance with this Agreement and the Act.

Member Minimum Gain. "Member Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability.

Member Nonrecourse Debt has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

Member Nonrecourse Deductions has the meaning set forth in Section 1.704-2(i) of the Regulations. Subject to the foregoing, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Company fiscal year equals the excess, if any, of the net increase, if any, in the amount of Member Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year over the aggregate amount of any distribution during that fiscal year to the Member that bears the economic risk of loss for such Member Nonrecourse Debt to the extent such distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i) of the Regulations.

Member Ownership Percentage. A Member's "Member Ownership Percentage" shall be the percentage of any Member's Member Interest relative to the aggregate of all Members' Member Interests. Each Member's Member Ownership Percentage is listed on EXHIBIT "A", as amended from time to time.

"Member Unit" means the personal property ownership right of a Member in the Company, which shall entitle such Member to (a) an allocation of the Net Profits and Net Losses as set forth herein, (b) distributions of cash or property as set forth herein, and (c) one vote for each Member Unit upon all matters that require or are submitted by the Board to a vote or other action by the Members. The Company shall not be authorized to issue more than One Thousand (1,000) Member Units unless otherwise Approved by the Board and a Majority in Interest of the Members

Minimum Gain. "Minimum Gain" as of any particular date, means an amount determined with respect to the Company as of such date in accordance with Section 1.704-2(d) of the Regulations.

Net Proceeds. "Net Proceeds" means the amount by which any cash proceeds received or collected by the Company from any Capital Transaction exceeds any closing or other costs, including taxes and commissions, incurred or required to be paid by the Company in connection with any such Capital Transaction.

Net Profit and Net Loss. The Company's "Net Profit" or "Net Loss" means, for each Fiscal Year, the Company's taxable income, gain or loss for such Fiscal Year, as determined under Section 703(a) of the Code, and Section 1.703-1 of the Regulations (and for this purpose all items to income, gain, loss, or deductible required to be stated separately pursuant to Section

703(a)(1) of the Code shall be included in taxable income or taxable loss), but with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section shall be subtracted from such taxable income or loss;

(c) In the event the Gross Asset Value of any Company asset is adjusted in compliance with Regulation Section 1.704-1(b), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(d) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, whenever the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of a fiscal year, depreciation, amortization or other cost recovery deductions allowable with respect to an asset shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income taxes of an asset at the beginning of a year is zero, depreciation, amortization or other cost recovery deductions shall be determined by reference to the beginning Gross Asset Value of such asset using any reasonable method selected by the Manager; and

(f) Any items of income, gain, loss or deduction which are specially allocated pursuant to Section 4.4 shall not be taken into account in computing Net Profits or Net Losses.

<u>Nonrecourse Deductions</u> has the meaning set forth in Sections 1.704-2(b)(1) and 1.704-2(c) of the Regulations. Subject to the preceding sentence, the amount of Nonrecourse Deductions for a Company fiscal year equals the excess, if any, of the net increase, if any, in the amount of Company Minimum Gain during that fiscal year (determined under Section 1.704-2(d) of the Regulations) over the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain ( determined under Section 1.704-2(h) of the Regulations).

Nonrecourse Liability has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

Notice. "Notice" means a written notice required or permitted by this Agreement which is given in the manner prescribed in Section 15.2.

Objectionable Transferee. "Objectionable Transferee" means any Entity that engages in a business that is in direct or indirect competition with the Company, as determined in good faith by the Board.

Permitted Transfer. "Permitted Transfer" means a Transfer of Member Units Member to: (a) a trust, partnership or other entity formed primarily for estate or family planning purposes (such as a family limited partnership) (collectively, a "Trust") that is solely for the benefit of the Member, a spouse or former spouse of such Member, one or more of the descendants of such Member's parents, or one or more of the descendants of such Member's spouse's or former spouse's parents (irrespective of the age of such descendants), if and so long as the terms of such Trust prohibit the distribution or other Transfer, free and clear of the Trust, of the Member Interest (or any portion thereof) to an Entity other than such Member or an Entity described in this clause; (b) subject to Section 13.1, if the Transfer occurs upon, as a result of, or in connection with the death of a Member, any of the individuals described in clause (a) above or any other individual by will or the laws of descent (except an Entity that is a creditor or competitor of the Company, as determined in good faith by the Board); or (c) an Affiliate of a Member if such Member (or the sole shareholder/member of the Member) owns one hundred percent (100%) of the outstanding equity interests (in terms of both voting power and value) in the Affiliate, except that a Transfer to an Objectionable Transferee under clauses (a) through (c) will not be considered a Permitted Transfer, and provided further, however, that any subsequent Transfer of any outstanding equity interest in the Affiliate, other than to any of the Entities described in clause (a), (b) or (c) above, will be considered not a Permitted Transfer.

Regulations. The "Regulations" means the Income Tax Regulations promulgated under the Code, as such Regulations may be amended from time to time. All references herein to specific sections of the Regulations shall be deemed to refer also to any corresponding provisions of succeeding Regulations.

Reserves. "Reserves" means, with respect to any Fiscal Year, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

Share of Minimum Gain. A Member's "Share of Minimum Gain," as of any particular date, means an amount determined with respect to such Member as of such date in accordance with Section 1.704-a(g)(i) of the Regulations.

Tax Distribution. "Tax Distribution" means any distributions by the Company to the Members, related to the Member's Tax Liability Amounts, pursuant to Section 5.8.

Tax Liability Amount. "Tax Liability Amount" means, with respect to a Member, for any given Fiscal Year, an amount equal to (a) the Assumed Tax Rate multiplied by (i) the taxable

income and gain allocated to such Member for such Fiscal Year (as shown on the applicable Internal Revenue Service Form 1065 Schedule K-1 filed by the Company), excluding partner-level taxable income adjustments made under Code Section 743(b) or allocations of taxable income or loss pursuant to Code Section 704(c), minus (ii) the cumulative losses that have been allocated to such Member to the extent such losses have not previously reduced taxable income and gain pursuant to this provision, minus (b) such Member's pro rata share of any creditable foreign taxes imposed on and paid by the Company to a non-U.S. governmental authority.

Transfer. The term "Transfer" is defined in Section 11.1.1 hereof.

Transferring Member. The term "Transferring Member is defined in Section 11.1.2 hereof.

Units. The term "Units" means the units of all classes of equity issued by the Company as approved by the Board, each such class of equity representing the right to receive distributions pursuant to the terms of this Agreement and granting the Member or Economic Interest Owner such other rights and privileges as set forth in this Agreement.

1.2 General Usage. The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Except where the context clearly requires to the contrary: (a) all references in this Agreement to designated "Sections" are to the designated Sections and other subdivisions of this Agreement; (b) use of the terms "herein" or "hereof" and other words of similar import refer to this Agreement as a whole and not to any particular Section, subsection, paragraph, clause or other subdivision; (c) instances of gender or entity-specific usage (*e.g.*, "his", "her", "its", "person" or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (d) the word "or" shall not be applied in its exclusive sense, unless the context otherwise requires; (e) "including" shall mean "including, without limitation"; (f) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto; and (g) references to "days" shall mean calendar days; references to "business days" shall mean all days other than Saturdays, Sundays and days that are legal holidays in the State of Delaware.

**ARTICLE 2**
**THE COMPANY**

2.1 Formation of Limited Liability Company. The Members have formed the Company, under the Act, effective as of the date upon which the Certificate of Formation and Certificate of Conversion were filed with the Secretary of State of Delaware. The Members hereby ratify, adopt and approve such formation by entering into this Agreement. The rights and liabilities of the Members will be determined pursuant to the Act, the Certificate of Formation and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement will, to the extent permitted by the Act, control.

Case ID: 100306480

2.2 Name. The name of the Company is Global Power Solutions, LLC. The Company may adopt such trade or business names as the Board shall consider appropriate. The Board shall file or cause to be filed such fictitious name certificates and similar filings, and any amendments thereto, that the Board considers appropriate or advisable.

2.3 Principal Office. The principal office of the Company shall be located at such place as the Board may from time to time and at any time designate after giving Notice of such designation to the Members. The Company may establish such additional places of business as may be determined by the Board, with the Approval of the Members.

2.4 Registered Agent and Registered Office. The initial registered agent and initial registered office of the Company is as set forth in the Certificate of Formation. Such registered agent and registered office may be changed from time to time by designation of the Board.

2.5 Purpose of Company. The purpose of the Company shall be:

(a) To engage in any lawful business, purpose or activity selected by the Members: provided, however, that unless the Members otherwise approve, the purpose of the Company shall be limited to contracting with domestic providers of engineering, construction and consulting services for the construction, operation and repair of utility facilities in the Middle East and the global development, marketing and sale of power generation and energy supply projects; and

(b) To exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, the property and funds held or owned by the Company (subject to applicable laws and this Agreement); and

(c) To engage in such other lawful transactions involving the Company's assets as the Board may, from time to time, determine, including entering into, making, and performing contracts and undertakings with respect thereto (subject to applicable laws and this Agreement); and

(d) To engage in all activities necessary, customary, convenient, or incident to the foregoing or such other lawful activities as the Board may deem appropriate, necessary or advisable (subject to applicable laws and this Agreement).

2.6 Powers of Company. The Company shall possess and may exercise all powers and privileges granted by the Act or any other law or by this Agreement, together with any powers incidental thereto, including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company as are reasonably connected with the Company's business described in Section 2.5.

2.7 Term. The term of the Company commenced upon the filing for record of the Certificate of Formation of Company, for and on behalf of the Company, in the office of the Secretary of State of the State of Delaware. The term of the Company, shall continue until the Company is dissolved, liquidated, and terminated under Article 14.

#1316,408,373

2.8 Tax Treatment. Except as set forth below, the Members intend that the Company will not be a partnership (including a limited partnership) or joint venture, and that no Member, Economic Interest Owner, Manager or officer will, solely by virtue of this Agreement, be a partner or joint venturer of any other Member, Economic Interest Owner, Manager or officer for any purposes, and this Agreement will not be construed to the contrary. The Members intend that the Company will be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment. The Company will not make any election to be treated as a corporation for federal and, if applicable, state income tax purposes, except with the approval of the Board.

2.9 Foreign Qualification. The Board will cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in any jurisdiction in which the Company owns property or transacts business to the extent, in the reasonable judgment of the Board, such qualification or registration is necessary or advisable for the protection of the limited liability of the Members or to permit the Company lawfully to own property or transact business. The Board may, and at the request of the Board or any officer, each Member will, execute, acknowledge, swear to and deliver any or all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue or terminate the Company as a foreign limited liability company in jurisdictions in which the Company may conduct business.

2.10 Representations and Warranties. Each Initial Member (and each other Entity which becomes a Member after the Effective Date, in accordance with the terms of this Agreement) hereby represents and warrants severally, and not jointly, to the Company and the other Members, as follows (such representations and warranties on the Effective Date or the subsequent date of admission as a Member being true and correct in all material respects, unless otherwise qualified as to materiality):

2.10.1 The execution, delivery and performance of this Agreement will not (a) conflict with, violate or result in a breach of any of the terms or conditions of any law or regulation or any order, injunction or decree of any court, governmental authority or arbitrator, applicable to such Member, (b) conflict with, violate, result in a breach of or require any consent under any of the terms, conditions or provisions of the governing instruments of such Member or of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of its material properties or assets is subject, or (c) result in the creation or imposition of any encumbrance upon any of the material properties or assets of such Member, except as permitted in or anticipated by this Agreement.

2.10.2 Such Member, if it is an entity, is duly incorporated, organized or formed, validly existing and in good standing under the laws of its jurisdiction of incorporation, organization or formation and the execution, delivery and performance by it of this Agreement is within its powers, has been duly authorized by all necessary corporate or other entity action on its behalf, requires no action by or in respect of, or filing with, any governmental body, agency or official. This Agreement constitutes a valid and binding agreement of such Member, enforceable against such Member in accordance with its

Case ID: 100306480

terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

2.10.3 If such Member is an individual, the execution, delivery and performance by such Member of this Agreement is within such Member's legal right, power and capacity, requires no action by or in respect of, or filing with, any governmental body, agency, or official. This Agreement constitutes a valid and binding agreement of such Member, enforceable against such Member in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

2.10.4 There are no actions, suits, proceedings or investigations pending or, to the knowledge of such Member, threatened against or affecting such Member or any of its properties, assets or businesses in any court or before or by any governmental arbitrator which, if adversely determined (or, in the case of an investigation, could lead to any action, suit or proceeding), would materially adversely effect such Member's ability to perform its obligations under this Agreement; and such Member is not in default; under any applicable order, injunction or decree of any court, governmental authority or arbitrator, which default would reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement.

All representations and warranties made by each Member in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement regardless of any investigation made by or on behalf of any such party.

2.11 Right to Sell Additional Member Interests. Subject to the prior Approval of Members owning at least sixty-five percent (65%) of the outstanding Member Units, the Board may, subject to the limitations described in this Section 2.11, raise additional capital for the Company by selling additional Member Units and admitting additional Members to the Company upon such terms and conditions as the Members may Approve. Any Entity acquiring a Member Interest hereunder may be admitted to the Company as a new Member (or if such Entity is already a Member, its Member Ownership Percentage may be increased), and no further consent to such admission (or increase in Member Ownership Percentage) by existing Members. By virtue of this provision, an existing Member's Member Interest may be diluted or subordinated upon the admission of additional Class A Members and each Member hereby consents to such dilution or subordination. Any new Class A Member shall be required to become a party to this Agreement, as in effect at such time, including all amendments thereto. No Entity may be admitted as a Member unless the Company has received evidence satisfactory to the Company to the effect that the admission of such party as a Member is exempt from the registration provisions of all applicable federal and state securities laws.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1 Initial Capital Contributions by Members. Except as may otherwise be provided herein, or agreed upon by the Board, upon the execution of this Agreement, the Initial Members shall contribute to the capital of the Company the amounts, or property set forth in Exhibit "A", attached hereto and made a part hereof, including the conversion of the former outstanding shares of stock of GPS, Inc. into Member Units of the Company, upon the filing of the Certificate of Conversion with the Secretary of State of Delaware. Entities becoming Members after the Effective Date, and becoming parties to this Agreement, shall make such Capital Contributions as determined by the Board.

3.2 Permitted Use of Capital Contributions. Capital Contributions shall be applied to the payment of costs incurred by the Company in connection with the conduct of its business as the Board determines to be appropriate. Such contributions may also be used, as the Board determines to be appropriate, to reimburse Members or Managers for costs incurred by them for, or on behalf of, the Company.

3.3 Additional Capital Contributions by Members. In the event that at any time or from time to time the Board believes the Company is in need of additional capital, or will be in need of additional capital within ninety (90) days, the Board may propose a capital call requiring Additional Capital Contributions by delivering a notice to each Member specifying (a) the total amount of the additional capital required, (b) the proposed use to which such capital will be applied and (c) a request for Approval of a capital call in such amount. Solely to the extent a Majority in Interest of the Members approves a capital call requiring Additional Capital Contributions, then within ten (10) days of such approval, the Manager shall send a notice ("Capital Call Notice") to each Member setting forth (i) the amount of the total capital call, (ii) the date the capital call was approved by the Members and (iii) such Member's pro-rata share of such capital call, such pro-rata share being equal to the Member's Member Ownership Percentage. All such Additional Capital Contributions shall be contributed by the Members within twenty (20) days following receipt of the Capital Call Notice.

3.4 Limit on Contributions and Obligations of Members. Except as expressly provided in this Article 3, the Members shall not be required or obligated (i) to make any Capital Contributions to the Company, (ii) to loan any money to the Company, or (iii) to endorse or to guaranty the payment or performance of any obligations of the Company.

3.5 Capital Accounts. A separate capital account ("Capital Account") shall be maintained for each Member in accordance with the following:

3.5.1 To each Member's Capital Account there shall be credited (A) the amount of money contributed or deemed contributed pursuant to Code Section 752 by the Member to the Company, (B) the fair market value, as of the date of contribution, of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or be subject to under Code Section 752), and (C) any allocation of items in the nature of income or gain, including tax exempt income and gain as provided in Treas. Reg. §1.704-1(b)(2)(iv).

71316.768.827

3.5.2 To each Member's Capital Account there shall be debited (a) the amount of money distributed or deemed distributed pursuant to Code Section 752 to the Member by the Company, (b) the fair market value, as of the date of distribution, of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject under Code Section 752), (c) allocations to such Member of certain Company loss and deductions as provided in Treas. Reg. §1.704-1(b)(2)(iv), and (D) certain other adjustments required to be made in accordance with Treas. Reg. §1.704-1(b)(2)(iv).

3.5.3 In the event any Member Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred Member Interest.

The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations and shall be applied in a manner consistent therewith and, as such, a Member's Capital Account shall also be increased or decreased to reflect any items described in Regulation Section 1.704-1(b)(2)(iv) that are required to be reflected in such Member's Capital Account under such Regulation and which are not otherwise taken into account in computing such Capital Account under this Section 3.5.

A loan by a Member to the Company (with the approval of the Board) shall not be considered a Capital Contribution to the Company and the balance of such Member's Capital Account shall not be increased by the amount so loaned nor decreased by the repayment of such loan (principal and interest) by the Company.

Notwithstanding anything contained herein to the contrary, the Members' Capital Accounts shall be at all times maintained in accordance with the provisions of Regulation Section 1.704-1(b)(2).

If the Board determines that the manner in which the Members' Capital Accounts are maintained should be modified, or that any particular item of income, gain, loss, deduction or credit should be allocated in a manner other than as provided above, in order to comply with the Treasury Regulations, the Board may make the modification or the allocation without the consent of any of the Members; provided, however, that no such amendment may be made to the extent it is likely to have a material effect on the amounts distributable to any Member (or Economic Interest Owner) during the term of this Agreement or upon dissolution of the Company.

3.6 Interest on and Return of Capital. No Member shall be entitled to any interest from the Company on such Member's Capital Account or on such Member's Capital Contributions to the Company, and except for distributions as provided in Articles 5 and 14, no Member shall have the right to demand or to receive the return of all or any part of such Member's Company Account or of such Member's Capital Contributions to the Company.

3.7 No Third Party Beneficiaries. The obligations of the Members to make Capital Contributions to the Company are only for the benefit of, and are only enforceable by, the

Case ID: 100306480

Company and the Members and shall not be for the benefit of, or be enforceable by, any other Entity.

3.8 Delinquent Unpaid Additional Capital Contributions. In the event that any Member ("Delinquent Member") refuses to or does not pay such Member's Additional Capital Contributions in accordance with Section 3.3, the non-delinquent Members may, with the consent of the Board determined without regard to any Manager who is a Delinquent Member, exercise one of the following options:

3.8.1 The Managers shall promptly notify all other Members of any Delinquent Member's failure to timely pay (within the period described in Section 3.3) an Additional Capital Contribution. The notice may also notify the Non-Delinquent Members as to what, if any, of the actions described in this Section 3.8, a Non-Delinquent Member will be permitted to take.

3.8.2 Each other Member ("Contributing Member"), provided it has timely paid its own Additional Capital Contribution pursuant to Section 3.3, may, within ten (10) days after receipt of such notice or such other period as established by the Board, elect to make all of such Delinquent Member's unpaid Additional Capital Contribution, or pro rata portion thereof if more than one Member desires to make such Delinquent Member's unpaid Additional Capital Contribution hereunder. In such event, the Member Interests of the Contributing Members and the Delinquent Member shall be adjusted based upon the total Capital Contributions made by each such Member relative to the total Capital Contributions made by all Members to the Company. No adjustments, under this Section 3.8, shall be made with respect to the Member Ownership Percentage of Members who are not Contributing Members or Delinquent Members. Solely for purposes of such calculation, distributions allocable to a Member's Capital Contribution Account shall not be considered. The effective date of such adjustments to the Member Interests and Member Ownership Percentages of the Contributing Members and the Delinquent Member shall be the date the Contributing Members make the Delinquent Member's unpaid Capital Contribution pursuant to this Section 3.8. Upon payment by the Contributing Members of the Delinquent Member's unpaid Additional Capital Contribution, the Delinquent Member shall cease to be delinquent as to such amount.

3.8.3 Any non-delinquent Member may, at its option, advance on behalf of the Delinquent Member to, or for the benefit of, the Company the amount of such Delinquent Member's unpaid Additional Capital Contribution, if any (determined following the application of Section 3.8.2). The amount of such advance shall be considered a debt due on demand from the Delinquent Member to the non-delinquent Member making the advance and shall be repayable by such Delinquent Member to the non-delinquent Member with interest at eighteen percent (18%) per annum (the "Delinquent Rate"). If a non-delinquent Member shall have made any advance hereunder in respect of any failure by a Delinquent Member to make any portion of any Additional Capital Contribution due under Section 3.3 hereof, then until such advance, plus any interest thereon, has been repaid in full to such non-delinquent Member, any distribution of the Company otherwise allocable and payable to the Delinquent Member shall be paid directly to such non-delinquent Member on account of such obligation, to be applied first to interest and next

to principal of such debt. In the event that a Member is delinquent on its obligations under Section 3.3 and more than one non-delinquent Member elects to advance amounts to the Membership pursuant to this 3.8.3, the advance to be made shall be split pro rata among the non-delinquent Members who so elect, in proportion to the relative percentage interest in the Membership (without regard to the Delinquent Member's ownership interest), or in such other manner as such electing, non-delinquent Members may agree.

3.8.4 In addition to the foregoing the Company shall have the right and authority to obtain a loan upon commercially reasonable terms, to fund the amount of the unpaid Additional Capital Contribution. (Such loan, as well as any other loan obtained by the Company, and all attendant costs thereof, shall be repaid in priority to any other distribution).

3.8.5 In the event a Member shall be delinquent in the payment of any Additional Capital Contribution requested, such Delinquent Member shall have no right to vote such Delinquent Member's Member Interest during the period of delinquency and the percentage vote required to authorize certain actions of the Members shall be proportionately reduced.

3.8.6 Any Member who fails to contribute its required share of Additional Capital Contributions hereby agrees to pay all resulting costs incurred by the Company and/or the Contributing Members, including but not limited to those costs incurred in seeking to (i) collect any indebtedness arising from the failure to contribute, (ii) any costs and fees related to any commercial loan procured by the Membership in place of the Delinquent Member's Additional Capital Contribution; and (iii) defend or otherwise protect the property of the Company from its creditors, (including reasonable attorney fees whether or not such action is litigated and also including any extra accounting fees necessitated by the extra bookkeeping required to account for the various amounts owed and not contributed or paid).

3.8.7 The options provided to the Members in this Section 3.8 are not exclusive, but are cumulative of, and in addition to, any rights or remedies which the Company may have at law or in equity against or with respect to a Delinquent Member for such Delinquent Member's refusal or failure to make an Additional Capital Contribution to the Company required of such Delinquent Member under Section 3.3, including, without limitation, the institution of legal proceedings to compel payment of the Delinquent Member's obligations to the Company. In the event the Company commences any such legal proceedings, the Delinquent Member shall be liable for all costs of such legal proceedings, including, without limitation, reasonable attorneys' fees and court costs.

3.9 Member Guarantees. To the extent any lender to the Company, or any other party, requires that the Company obligations to such lender or other party be guaranteed by a Member, and a Member, in its sole and absolute discretion, agrees to guaranty such Company obligations, the Company shall indemnify the Member guarantying such obligations against all losses, expenses and liabilities with respect to such guaranty.

'II 316,408.8

3.10 Loans from Related Parties. Subject to any Approvals required under this Agreement, the Company may borrow funds from any Member, Manager or Affiliate thereof for any authorized Company purpose and, in connection therewith, mortgage, pledge, or otherwise encumber any asset of the Company as security therefor, provided that any such loan and security shall be upon terms no less favorable to the Company than the terms then available to the Company from unrelated third party lenders or, if no such third party terms are available to the Company, on such terms as the Board deems commercially reasonable.

## ARTICLE 4
## ALLOCATION OF PROFITS AND LOSSES

4.1 Allocation of Profits and Losses.

4.1.1 The rules set forth below in this Section 4.1 shall apply for the purpose of determining each Member's allocable share of the items of income, gain, loss and expense of the Company comprising Net Profits or Net Losses of the Company for each taxable year, determining special allocations of other items of income, gain, loss and expense, and adjusting the balance of each Member's Capital Account to reflect the aforementioned general and special allocations. For each taxable year, the special allocations in Section 4.4 shall be made immediately prior to the general allocations of Section 4.1.

4.1.2 For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and all special allocations pursuant to Section 4.4 with respect to such Fiscal Year, all Net Profits and Net Losses (other than Profits and Losses specially allocated pursuant to Section 4.4) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount which would be distributed to such Member, determined as if the Company were to liquidate all of its assets for the Gross Asset Value thereof and distribute the proceeds thereof pursuant to Section 14.2 hereof, minus (b) the sum of (i) such Member's share of Company Minimum Gain" (as determined according to Regulation Sections 1.704-2(d) and (g)(3),) and Member Nonrecourse Debt Minimum Gain" (as determined according to Regulation Section 1.704-2(i)) and (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year.

4.2 Limitation on Loss Allocations. Notwithstanding anything in this Agreement to the contrary, no loss or item of deduction shall be allocated to a Member if such allocation would cause the Capital Account of such Member to have a deficit in excess of the sum of (i) the amount, if any, of additional capital such Member would be required to contribute to the Company if the Company were to dissolve on the last day of the accounting period to which such allocation relates plus (ii) such Member's distributive share of Company Minimum Gain as of the last day of such accounting period, determined pursuant to Regulation Section 1.704-2(g)(1), plus (iii) such Member's share of Member Minimum Gain as of the last day of such year, determined pursuant to Regulation Section 1.704-2(i)(5). Any amounts not allocated to a

Member pursuant to the limitations set forth in this paragraph shall be allocated to the other Members to the extent possible without violating the limitations set forth in this paragraph.

4.3 Intentions and Construction of Allocations. It is the intention of the Members to allocate Net Profits and Net Losses in such a manner as to cause each Member's Capital Account to always equal the amount of cash such Member would be entitled to receive if the Company sold its assets for their fair market values and, after satisfying all Company liabilities, the proceeds from such sale, as well as all other funds of the Company, were then distributed to the Members pursuant to Section 5.2. It is the intention of the Members that the aggregate Net Profits allocated to the Members pursuant to this Agreement equal the economic profits of the Members (i.e. the excess of distributions over capital contributions to the Company). These provisions shall be so interpreted as necessary to accomplish such result.

4.4 Special Allocations.

The following special allocations shall be made in the following order:

4.4.1 Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Regulations, in the event there is a net decrease in Company Minimum Gain during a Company taxable year, each Member shall be allocated (before any other allocation is made pursuant to this Article 4) items of income and gain for such year (and, if necessary, for subsequent years) equal to that Member's share of the net decrease in Company Minimum Gain. The determination of a Member's share of the net decrease in Company Minimum Gain shall be determined in accordance with Regulation Section 1.704-2(g). The items to be specially allocated to the Members in accordance with this Subsection 4.4.1 shall be determined in accordance with Regulation Section 1.704-2(f)(6). This Subsection 4.4.1 is intended to comply with the Minimum Gain chargeback requirement set forth in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

4.4.2 Member Minimum Gain Chargeback: Except as otherwise provided in Regulation Section 1.704-2(i)(4), in the event there is a net decrease in Member Minimum Gain during a Company taxable year, each Member who has a share of that Member Minimum Gain as of the beginning of the year, to the extent required by Regulation Section 1.704-2(i)(4) shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to that Member's share of the net decrease in Member Minimum Gain. Allocations pursuant to this Subsection 4.4.2 shall be made in accordance with Regulation Section 1.704-4(i)(4). This Subsection 4.4.2 is intended to comply with the requirement set forth in Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

4.4.3 Qualified Income Offset Allocation. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) which would cause the negative balance in such Member's Capital Account to exceed the sum of (i) his obligation to restore a Capital Account deficit upon liquidation of the Company, plus (ii) his share of Company Minimum Gain determined

Case ID: 100306480

pursuant to Regulation Section 1.704-2(g)(1), plus (iii) such Member's share of Member Minimum Gain determined pursuant to Regulation Section 1.704-2(i)(5), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess negative balance in his Capital Account as quickly as possible. This Subsection 4.4.3 is intended to comply with the alternative test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

4.4.4 Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Company fiscal year which is in excess of the sum of (i) any amounts such Member is obligated to restore pursuant to this Agreement, plus (ii) such Member's distributive share of Company Minimum Gain as of such date, plus (iii) such Member's share of Member Minimum Gain determined pursuant to Regulation Section 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Subsection 4.4.4 shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article IV have been made, except assuming that Subsection 4.4.3, and this Subsection 4.4.4 were not contained in this Agreement.

4.4.5 Allocation of Nonrecourse Deductions. Nonrecourse Deductions shall be allocated to the Members in accordance with their respective Member Ownership Percentage.

4.4.6 Allocation of Member Nonrecourse Deductions. Member Nonrecourse Deductions shall be allocated as prescribed by the Regulations.

4.4.7 Allocation of Nonrecourse Liabilities. The "excess nonrecourse liabilities" of the Company (within the meaning of Section 1.752-3(a)(3) of the Regulations) shall be allocated to the Members in accordance with their respective Ownership Percentage.

4.4.8 Recapture. Ordinary taxable income arising from the recapture of depreciation and/or investment tax credit shall be allocated to the Members in the same manner as such depreciation and/or investment tax credit was allocated to them.

4.4.9 Code Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Member Interest, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

4.5 Curative Allocations. The allocations set forth in Section 4.4 hereof, (the "Regulatory Allocation") are intended to comply with certain requirements of Regulation Section 1.704-1(b). Notwithstanding any other provisions of this Section 4 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other profits, losses and items of income, gains, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other profits, losses and other items in the Regulatory Allocations to the Members shall be equal to the net amount that would have been allocated to them if the Regulatory Allocations had not occurred.

4.6 Character of Gain. In the event any sale gain recognized by the Company in any Fiscal Year is for income tax purposes in part ordinary income and in part capital gain, then, for income tax purposes and subject to Section 4.4, each Member's distributive share of such ordinary income shall be the lesser of (i) the entire amount of such sale gain allocated to such Member, or (ii) an amount determined by multiplying the total amount of such ordinary income required to be recognized by the Company by a fraction, the numerator of which shall be the amount of excess depreciation allocated to such Member for income tax purposes through the sale date and the denominator of which shall be the amount of such excess depreciation allocated to all of the Members for income tax purposes through the sale date.

4.7 Adjustment of Percentage Interests. In the event the percentage interests in the Company of the Members are adjusted during a Company Fiscal Year and the effective date of such adjustment is other than on the first day of a Fiscal Year, the Company's Net Profit or Net Loss, as the case may be, shall be computed and allocated pursuant to Sections 4.1 and 4.2 hereof, respectively, as if the periods between such variation were each a separate Fiscal Year.

4.8 Allocations to Take Account of Differences Between Gross Asset Value and Tax Basis of Property. Income, gain, loss or deduction with respect to any property contributed by a Member shall, solely for tax purposes, be allocated among the Members, to the extent required by Code Section 704(c) and the related Treasury Regulations under Code Sections 704(b) and 704(c), to take account of the variation between the adjusted tax basis of such property and its Gross Asset Value at the time of its contribution to the Company. If the Gross Asset Value of any Company property is adjusted, as provided in Treasury Regulations Section 1.704-1(b)(2)(iv), then subsequent allocations of income, gain, loss and deduction shall be as provided in Code Section 704(c) and the related Treasury Regulations. Allocations under this Section 4.8 shall be made in accordance with the traditional method set forth in Treasury Regulation Section 1.704-3(b) and are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, or other items or distributions under any provision of this Agreement.

## ARTICLE 5
## DISTRIBUTIONS TO MEMBERS

5.1 Determination of Distributable Cash. The Distributable Cash of the Company shall be determined by the Board at least annually but may be determined at such other times during the Company's Fiscal Year as the Board or the Members deem appropriate.

9I 316,408.S73

5.2 Distribution of Distributable Cash. Except as otherwise provided in Article 14 and this Article 5, and subject to any contractual restrictions thereon agreed to by the Company, the Distributable Cash of the Company, as determined under Section 5.1, shall be distributed to the Members on an annual or more frequent basis, as may be determined from time to time by the Board (or the Members). Amounts of Distributable Cash, if any, being distributed to the Members hereunder shall be distributed in the following manner and in the following order or priority:

5.2.1 First, to the Members in proportion to their respective Capital Contribution Account balances until their Capital Contribution Account balances are reduced to zero; then, any additional amounts

5.2.2 To the Members in accordance with their respective Member Ownership Percentages.

5.3 Distribution of Net Proceeds. Except as otherwise provided in Article 14 and this Article 5, any Net Proceeds received or collected by the Company after the date hereof shall be distributed by the Company to the Members, within ninety (90) days after such Net Proceeds are received or collected, in the following manner and in the following order of priority:

5.3.1 First, to the repayment or prepayment of such debts and liabilities of the Company as the Managers shall determine to be in the best interests of the Company; then, any additional amounts

5.3.2 To the establishment of such Reserves as the Managers deem appropriate for (i) the repayment of any debts and liabilities of the Company, (ii) the working capital requirements of the Company, (iii) any contingent or unforeseen liabilities of the Company; provided, however, that at the expiration of such period as the Board deems advisable, the balance of such reserves shall be distributed to the Members in the manner hereinafter provided; then, any additional amounts

5.3.3 To the Members in proportion to their respective Capital Contribution Account balances until their Capital Contribution Account balances are reduced to zero; then, any additional amounts

5.3.4 To the Members in accordance with their respective Member Ownership Percentages.

5.4 Distributions Following Liquidation. In the event of the dissolution of the Company in accordance with Article 14 below or any other event which results in a "liquidation" of the Company (within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations), after making provision for expenses, debt, Reserves and otherwise in accordance with Sections 5.3.1 and 5.3.2 (in the event such event does not constitute a dissolution under Article 14) or Sections 14.2.1 and 14.2.2 (if the event does constitute a liquidation and dissolution under Article 14), remaining proceeds shall be distributed to the Members in accordance with Sections 5.3 or 14.2, as the case may be. All distributions pursuant to this Section 5.4 shall be made in accordance with Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations.

5.5 Consent to Distributions. Each of the Members hereby consents to the distributions provided for herein.

5.6 Adjustment of Percentage Interests. In the event the percentage interests of the Members are adjusted during a Fiscal Year pursuant to Section 4.1 hereof, Distributable Cash shall be determined pursuant to Section 5.1 and distributed pursuant to Section 5.2 hereof for the period commencing with the beginning of the Fiscal Year in which such adjustment is effected (or, if later, the date of the most recent prior adjustment of Company percentage interests) and ending on the date immediately preceding the effective date of such adjustment as if such period were also a Fiscal Year, and Distributable Cash shall be determined pursuant to Section 5.1 and distributed pursuant to said Section 5.2 for the period commencing with the effective date of such adjustment and ending on the last day of the Fiscal Year in which such adjustment is effected as if such period were also a Fiscal Year.

5.7 Withholding on Members. The Company will at all times be entitled to make payments with respect to any Member in amounts required to discharge any obligation of the Company to withhold or make payments to any taxing authority or other governmental entity with respect to any Distribution, allocation of income or gain, or compensation paid or deemed paid to such Member that arises as a result of such Member's Member Interest or receipt of an interest in the Company. If the Company makes any payment to a taxing authority or other governmental entity in respect of a Member hereunder that is not withheld from a concurrent Distribution to the Member, then the Member will reimburse the Company for the amount of such payment, plus interest, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a Distribution) to the Company at the Prime Rate from time to time (and any such payment will not constitute a Capital Contribution). The amount of a Member's reimbursement obligation under this Section 5.7, to the extent not paid, will be deducted from the Distributions to such Member; any amounts so deducted will constitute a repayment of such Member's obligation hereunder. Any funds withheld from a Distribution by reason of this Section 5.7 will nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. Each Member's reimbursement obligation under this Section 5.7 will continue after such Member Transfers all or any portion of its Member Interest or Units in the Company or after a withdrawal by such Member, in each case in accordance with the terms hereof. Each Member agrees to furnish the Company with any representations and forms as may reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member or imposed in respect of compensation paid or deemed paid to such Member. Any amount payable as indemnity hereunder by any Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any Distribution due to such Member for all such amounts. "*Prime Rate*" means the rate published as the prime rate for such date (or if such day is not a business day, for the immediately preceding business day) by the *Wall Street Journal* or, if the *Wall Street Journal* does not publish the prime rate, by any publication or other source reasonably selected by the Board.

5.8 Tax Distributions. Notwithstanding the foregoing provisions of Article 5, to the extent Distributable Cash is available, the total Distributions to a Member for each Fiscal Year (and the 90-day period following such Fiscal Year) shall not be less than such Member's Tax Liability Amount. To the extent that such minimum Distributions requirement increases the amount of Distributions beyond the amount to which a Member would be entitled in the absence thereof, the excess portion shall be considered a prepayment of future Distributions allocable to such Member; provided that adjustments to any such future distributions to that Member shall not decrease his aggregate Distributions below an amount necessary to meet the Tax Liability Amount for such Member for subsequent Fiscal Years.

## ARTICLE 6
## MEMBERS

6.1 Limited Liability. Notwithstanding the provisions hereof for the allocation of the Company's Net Loss and for the distribution of cash to the Members by the Company, except as otherwise provided in Article 3 or specifically required under the Act or this Agreement, the Members shall not be required to make any Capital Contributions to the Company for the payment of any losses incurred by the Company or for any other purposes and the Members shall not, solely by reason of being a Member and a party to this Agreement, be responsible or obligated to any third parties for any debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise.

6.2 Negative Capital Accounts. The Members shall not be required to pay to the Company or to any other Member any deficit or negative balance which may exist from time to time in their respective Capital Accounts as a result of the provisions hereof for the allocation to the Members of the Company's Net Loss and for the distribution of cash to the Members by the Company.

6.3 Confidentiality. The Members will not, and will use their good faith efforts to cause their Affiliates to not, use or disclose to any Entity (other than a Member) any trade secrets, technical information, processes, know-how, financial or business data or other proprietary information relating to or in the possession of the Company, including the Company's long-term business plan (collectively, "**Proprietary Information**") for any purpose which does not relate to the Company; provided, however, that a Member may disclose any such Proprietary Information: (a) that has become generally available to the public (other than disclosure by the Member in violation of this Section 6.3); (b) to its employees and professional advisers who need to know such information and agree to keep it confidential in accordance with the terms of this Section 6.3; (c) to the extent required in order to comply with contractual reporting obligations to its members who have agreed to keep it confidential in accordance with the terms of this Section 6.3; (d) to the extent necessary in order to comply with any law, order, regulation or ruling applicable to such Member; and (e) as may be required in response to any summons, subpoena or discovery request in connection with any litigation or proceeding, it being agreed that, unless such Proprietary Information has become generally available to the public (x) the Member will give the Company prompt notice of such summons, subpoena or discovery request and will cooperate with the Company at the Company's request so that the Company may, in its discretion, seek a protective order or other appropriate remedy, if available, and (y) in the event that such protective order is not obtained (or sought by the Company after

notice), the Member (1) will furnish only that portion of the Proprietary Information which, in accordance with the advice of counsel, is legally required to be furnished and (2) will exercise its reasonable efforts to obtain assurances that confidential treatment will be accorded such Proprietary Information; provided, further, that nothing contained in this Section 6.3 will prohibit any Member from disclosing Proprietary Information in the context of a proposed sale of its Member Interest or Economic Interest in the Company in accordance with this Agreement to an Entity who has first signed and delivered to the Company a confidentiality agreement in a form reasonably acceptable to the Company.

6.4 Member Meetings; Voting.

6.4.1 In any matter described in this Agreement on which any Member is entitled to grant or deny such Member's Approval, such Member may accomplish the same by attending any meeting convened by the Board for all of the Members. Upon receiving a written request signed by the holders of not less than twenty percent (20%) of the Member Units then outstanding, requesting that the Board convene a meeting of the Members to consider approval of any action upon which the Members are entitled to vote, the Board shall convene a meeting of the Members and shall submit any matter (upon which the Members are entitled to vote) to such Members for a vote at such meeting. Notice of any such meeting shall be given not less than seven (7) days nor more than sixty (60) days before the date of the meeting to each Member. Notice may be given personally or by first class mail, facsimile, electronic mail or overnight delivery and shall be deemed given three (3) business days after being mailed, if mailed, or one business day after being sent by facsimile or electronic mail (with delivery confirmation) or being delivered to a nationally recognized overnight delivery service, addressed to the Member at the Member's address as it appears on the records of the Company.

6.4.2 A Member may grant to any person a special or general power of attorney to vote for such Member at any such meeting. The presence in person or by proxy of holders of not less than a Majority in Interest of all outstanding Member Units shall constitute a quorum at any such meeting, and any action requiring Approval of a Majority in Interest of the Members or a Majority in Interest of the Members under this Agreement may be taken by a Majority in Interest of the Members, whether or not present in person or by proxy at any such meeting. Any Member may participate in a meeting of the Members by means of conference telephone or similar communications equipment, by means of which all participating Members can hear each other. Such participation shall constitute presence, in person, by such Member at such Members meeting.

6.4.3 Notwithstanding the foregoing, any action that is required to be or may be taken at a meeting of the Members may be taken without a meeting if written consent, setting forth the action, shall be signed by Members, in person or by proxy, who would be entitled to vote at a meeting those Member Interests having voting power to cast not less than the minimum number (or numbers, in the case of voting by classes) of votes that would be necessary to authorize or take such action at a meeting at which all Member Interests entitled to vote were present and voted. A consent transmitted by "electronic transmission" (as defined in Section 18-404(d) of the Act), by a Member or a person or persons authorized to act for a Member shall be deemed written and signed for purposes

Case ID: 100306480

of this subsection. If any action under this Section 6.4.3 is taken by less than unanimous written consent of the Members, Notice of such action shall be given to those Members, determined on the effective date of such action, whose Member Interests were not represented on the written consent, provided that the failure to give such notice shall not invalidate the consent or action so taken.

## ARTICLE 7
## MANAGEMENT OF COMPANY

7.1 Powers and Duties of Managers. Except as otherwise provided in this Agreement, the Board shall be responsible for, and have the right, power and authority with respect to, the conduct of the Company's business and affairs. Subject to the provisions of Sections 7.3 and 7.4, the Board shall have, and is hereby granted, full and complete power, authority, and discretion to take such action for and on behalf of the Company, and in its name, as the Board deems necessary or appropriate to carry out the purposes for which the Company was organized. The Managers shall devote such time and effort to the Company as they deem necessary for the Company's welfare and success. The Board may delegate to any officers such power and authority as the Board determines is appropriate. At any time that there is more than one (1) Manager on the Board, actions by the Board shall require the approval of a majority of the Managers on the Board. Except as may be permitted or approved by the Board, if there is more than one (1) Manager, no Manager, in such capacity, shall be authorized to bind or act on behalf of the Company. In the event that a Manager is other than an individual, such Manager shall act through its duly authorized representatives.

7.2 Officers. The Board may, but is not required to, appoint from time to time such officers of the Company as it shall determine. All officers shall serve at the pleasure of the Board. The Board may remove any officer at any time, with or without cause, whenever in its judgment the best interests of the Company will be served thereby. Such officer positions may include, without limitation, one or more of the following: President, Vice President, Treasurer and Secretary. A person may hold one or more of such officer positions and need not be a Member or Manager, except that the Chairman, if any, must be a Manager.

7.2.1 President. The President shall, subject to the limitations established by the Board, act as the chief executive officer of the Company and shall supervise the policies of the Company and general and active day-to-day management of the business of the Company. The President shall execute bonds, mortgages and other contracts or agreements to which the Company is a party, except where required or permitted by law to be otherwise signed and executed, and except where the signing and execution thereof shall be expressly delegated by the Board to some other officer or agent of the Company

7.2.2 Executive Vice President. The Executive Vice President shall perform such duties and have such powers as may from time to time be delegated by the President or the Board.

7.2.3 Secretary. The Secretary shall keep minutes of all Manager and Member meetings and have charge of the minute books and shall perform such other duties and

11316.405827

have such other powers as may from time to time be delegated to the Secretary by the President or the Board.

7.2.4 Treasurer. The Treasurer shall assist the Board in the management of the financial affairs of the Company, shall have the power to recommend action concerning the Company's financial affairs to the President and Board, and shall perform such other duties and have such other powers as may from time to time be delegated to the Treasurer by the President or the Board.

7.3 Limitations on Actions.

Notwithstanding the foregoing, and subject to Section 3.8.5, neither the Managers nor officers shall, without the prior consent of both the Board and a Majority in Interest of Members, have authority to:

(a) borrow on the credit of the Company, or refinance any approved loans or indebtedness of the Company, except as otherwise provided in this Agreement or in accordance with any budget, that shall have been Approved by the Members pursuant to this Section 7.3;

(b) subject all or any portion of the Company's assets to any security interest, lien or other encumbrances;

(c) execute or deliver any note or other commercial paper which subjects the Company or any Member to liability;

(d) purchase, contract to purchase, lease or execute any option for the purchase of any real property, or any personal property with a value in excess of $50,000;

(e) sell, exchange, convey, lease, or otherwise transfer any significant Company property, or portion thereof, or grant to any person an option with respect thereto;

(f) take any action which expressly requires the Approval of the Members under this Agreement;

(g) admit Members to the Company or issue any additional Member Units to any Entity;

(h) redeem the Member Units of any Member;

(i) borrow funds from the Company;

(j) make a payment to a Member, except as otherwise provided in this Agreement, or in accordance with a budget that shall have been Approved by the Members pursuant to this Section 7.3;

(k) confess a material judgment against the Company, commence any material legal action against a third party or settle any material legal action involving the Company;

(l) make any election under the tax laws of the United States or the State of Delaware, except as expressly permitted in this Agreement;

(m) enter into any contract or agreement by the Company that shall obligate the Company, either directly or contingently, to provide products or services valued in excess of, or pay more than, $50,000 over the entire term of the contract or agreement;

(n) merge or consolidate the Company with or into any other Entity;

(o) settle condemnation, litigation or insurance matters if such settlement provides for the payment by or to the Company of more than $50,000.00;

(p) select professional advisers for the Company, including certified public accountants and attorneys;

(q) determine the Company's accounting method;

(r) modify or amend the Certificate of Formation;

(s) cause the Company to guarantee or become obligated for the debts or obligations of any other person or entity or hold out its credit as being available to satisfy the obligations of others, or pledge its assets for the benefit of any other person or entity; or

(t) elect any person or entity to act as a Manager of the Company.

7.4 Compensation for Services. Except as specifically approved by the Members, or as set forth in a budget Approved by the Members, no Manager or officer shall receive any compensation from the Company for its services as a Manager or officer of the Company. This provision shall not limit amounts which may be due to a Manager or officer for services rendered pursuant to other agreements or arrangements between the Company and the Manager or officer.

7.5 Election of the Managers. The Board will initially be composed of one (1) Manager, unless or until the size of the Board is changed with the Approval of the Board and a Majority in Interest of the Members. Each Manager shall hold office until such Manager resigns, retires, dies or is removed in accordance with the terms of this Agreement.

7.6 Limited Member Management. Except as otherwise provided in this Agreement or as specifically required by the Act, the Members, in such capacity, shall not participate in the management of the Company's Business and affairs or have any right or authority to act for or to bind the Company nor execute any agreement or instrument on behalf of the Company.

7.7 Liability of Managers and Officers. So long as a Manager or officer shall act in good faith with respect to the conduct of the business and affairs of the Company, the Manager